We now have the Center for Investigative Reporting case, um, one moment. Counsel. I'd like to reserve two minutes for rebuttal, please. And you're taking all 15, yeah? I mean, at the ACLU. Oh, yeah, we're not splitting time. That's correct. May I proceed? Yes, please. CIR's ads promoting its investigative journalism were rejected pursuant to an arbitrary exercise of discretion. As in Minnesota Voters Alliance v. Mansky, SEPTA's prohibitions on political and issue ads offer no sensible basis for distinguishing what may come in from what must stay out. Well, let me ask you this. Is there some formulation of a policy that would permit SEPTA to decline to run the advertisement? Certainly, Your Honor. There are any number of ways that SEPTA could reserve its ad space for ads or certain speakers that do not include the Center for Investigative Reporting. For example, it could decide that its ad space is only for vendors at SEPTA's 200-plus stations. That then CIR would have no claim to advertise there, but it has not closed the forum in this manner, nor has it so broadly restricted the types of issues that advertisers can advertise about that it has effectively restricted the breadth of access in a way that would close the forum. So the ad space remains a designated public forum, but in any event, even if it were a non-public forum, the restrictions here are not reasonable because without objective workable standards to guide SEPTA's decision-making, the determination of what is political or an issue ad is essentially random. We've seen many inconsistent outcomes here. For example, housing discrimination is illegal, is political, according to SEPTA, but landlords are required to ensure your home is safe from lead, is not. Apply to be a sperm donor is political, but surrender to law enforcement is not. Philadelphia students support cleaner water is political, but the Clean Air Council's ad urging people to recycle and save water is not. Education isn't a problem, it's a solution, is a political slogan, SEPTA says, but warning about fake news on Facebook is not. Unions welcoming the Democratic National Convention of Philadelphia is political, but corporations welcoming the DNC is not. The message unplanned pregnancy, consider adoption, is political, but join the millions, sign up for Obamacare is not. The district court ruling upholding the rejection of CIR's ad encompasses several legal errors, each of which is an independent and sufficient grounds for reversal, but I'd like to focus on how the new restrictions, as edited by the district court, are still incapable of reasoned application and thus unconstitutional in any forum. You have no problem with the fact that the district court tried to take a hand to the policy. Your problem is merely the result of taking the hand to the policy. That's correct, Your Honor. Our argument that the district court exceeded its authority has to do with how it rewrote the standards, not the fact that it revised them. The problem is that there's simply no basis in law or fact for leaving some undefined uses of the term political while striking one of them. And with respect to subsection B, the district court, when it took out the phrase matters of public debate, it left in place a very different and much broader prohibition. So even though the words of the revised B were all in the original, the meaning is very different. You know, when I read that, what entered my mind, I must tell you, is suppose somebody put up a poster and it said, why locally support your local merchants? I don't think anybody would really object to that, and yet it certainly is an advertisement expressing an opinion on an economic matter. I agree, Your Honor. Now, in a sense, I thought it made it worse when they said matters of public debate because you could say if it had to be matters of public debate, well, that wouldn't have been a matter of public debate. I mean, I really didn't know where you'd go. I mean. I agree, Your Honor. SEPTA testified that every ad expresses a viewpoint, so it's hard to understand how the revised B wouldn't prohibit every ad that runs, which they all express a viewpoint and they all deal with some kind of issue. So, you know. So because of the inexactitude of a political in this context, you don't view it as viewpoint discrimination, do you? Our viewpoint discrimination argument isn't as applied when it doesn't have, it's not a facial challenge to the language of the revised restrictions. Does that answer your question at all? As applied because they have ads from banks that say we don't discriminate. That's correct, Your Honor. As the way that A and B were revised, still the plain language of them is unconstitutional on its face because it's unreasonable under Manski. And indeed, if you look at all of the different definitions of political in Manski that the Supreme Court struck down as incapable of reasoned application, they map up basically onto the revised pieces of the pieces of A and B even as revised. Well, I guess what I'm asking is, as you think about free thought on the one hand and Manski on the other, it's not a free thought case because it doesn't easily fit within, you know, the viewpoint discrimination where it's clearly aimed at a particular viewpoint, right? That's correct, Your Honor. Like Manski, because of the inexactitude of the term political, you'd say, well, I think your point's been, how could you possibly have a reasonable application? That is correct, Your Honor. Our argument is not that all bans on political speech inevitably play out in viewpoint discriminatory ways, which was the problem with the religious, one of the problems with the religious ban in free thought. SEPTA's, well, even with the revisions that the district court made, whether an ad is prohibited by A or B turns entirely on the background knowledge and media consumption of the official applying the restrictions, as in Manski. SEPTA's designee testified that he decides what is subject to debate and what is not by Googling phrases related to an ad and then applying his experience in 56 years of life, schooling, and legal practice, and his knowledge from talking to other people, seeing what they think, getting their opinions. You know, when I read this bait, I couldn't help but think it's inevitable that your viewpoint would come in. Now, I wouldn't object to an ad saying support your local merchant, but I'll give you another political ad. Now, that's an economic ad, but you could call it political. And if I were the person viewing it, I wouldn't allow an ad that says support the Ku Klux Klan. So that's a viewpoint. It's an almost impossible thing to draw unless it's really narrow. It's very difficult to see how you can not get into a quandary. It would be like they said with pornography. You know, one of the justices said he knows it when he sees it. Well, I know the ad that shouldn't be there when I see it, but I don't think that could be the test. You're absolutely right, Your Honor. And this is why courts have long held that vague restrictions on speech that vest essentially unbridled discretion violate the First Amendment, because there's always that risk that they will be applied in viewpoint discriminatory ways. And here, certainly, the lack of guidance did lead to inconsistent outcomes, which raises the specter of arbitrary enforcement, to use a phrase from the Freethought decision. Let me ask you this question. Obviously, matters of public debate has been removed in the current advertising standards of the revised law. Yes, Your Honor. If you remove political, are there any other terms in A and B that are objectionable? Well, B would then prohibit advertisements expressing or advocating an opinion, position, or viewpoint on economic, religious, historical, or social issues. And there's nothing in the record to help define what constitutes an economic, religious, historical, or social issue. And indeed, SEPTA defined a social issue quite broadly as anything that involves society or the people in society or impacts society at large. So I do not think that that would be capable of reasoned application either, Your Honor. In response to Judge Greenway's first question about how they could do it right, you said they could limit the ads to vendors. What do you mean vendors? Well, I was thinking SEPTA has 200-some stations. Many of these stations have vendors who sell news, for example. They could say that only vendors in SEPTA stations can advertise. Or a slightly different one. They could limit it to commercial advertisements only. And they could do this not with all of their ad space, but with just some part of the ad space. For example, Just the Inside of Buses is now a closed forum for only commercial advertisements. You could do commercial ads for Dunkin' Donuts and Under Armour and so on. Wouldn't you run into some of the same issues when you had ads from Nike and Chick-fil-A and maybe the NBA and all sorts of people? Absolutely. So in addition to once you've actually closed the forum, you can then adopt a reasonable content-based restriction. So, for example, you could restrict speech that will incite violence or lawlessness or disruption. If your concern is AFDI, which SEPTA testified it was, the problem with SEPTA's content-based restrictions, even assuming that we have a non-public forum, which we do not, and even assuming that they were workable, which they are not, is that they do not broadly close the forum to all speech on public issues. They really only target the ones that SEPTA deems to be political. The government is not supposed to be able to enact narrow content-based restrictions just on the speech that they don't like. You know, I couldn't help but wonder what we're doing here. And I noticed that the trial judge took a pen and he went over the regulation. Now, we have an appeal from that. And I'm not looking forward, frankly, to drawing a new regulation. I mean, shouldn't we just say, look, this is constitutional or it isn't? And then at that point, leave it up to SEPTA. But to start drawing a new regulation, you're going to get in a lot of issues. What are you looking for? Do you just want us to outlaw this regulation as amended by the district court? Or do you want us to draw a new regulation? I mean, drawing a new regulation, that's real hardball. Your Honor, to look to the Supreme Court for guidance, in Minnesota Voters Alliance v. Mansky, the Supreme Court did not rewrite the political apparel ban for Minnesota. It simply said the way you have done this is unconstitutional. There may be more constitutional ways to do it, but you have to do that yourself. The remedy you're looking for is it's unconstitutional, run my ad. That's right, Your Honor. The court should reverse with instructions to enter judgment for CIR and enjoin SEPTA from applying its ad policy to exclude CIR's ads. But the court should not redraw the regulation if you lose, if you win. I agree with that, Your Honor. I think what's before the court is what the district court did, and that it's always going to be SEPTA's burden to justify any restrictions on speech based on its goals and the record evidence. But shouldn't there be a way, though, that SEPTA can reject an ad saying support the Ku Klux Klan? That's a viewpoint point on my part. Your Honor, I think if SEPTA adopted a viewpoint neutral restriction that prohibited ads that will incite lawlessness like vandalism, which SEPTA testified was a concern, or violence or disruption of the transit system, that would most likely be reasonable even in a non-public forum and perhaps would survive strict scrutiny even in a designated public forum because certainly incitement is not protected by the First Amendment. But that's not this case. We represent CIR, not the KKK. And their ad was not rejected because SEPTA thought it would incite lawlessness or disrupt the transit system, but because SEPTA deemed it political in a matter of public debate. Back to form analysis. Lackawanna County tried to close its forum. We said it didn't. After Christ's Bride, SEPTA says we're trying to close our forum, and you're saying they haven't. Is that because they keep inadvertently letting ads through, or you're saying the policy itself still isn't closed? I think the policy as they interpret it only prohibits such narrow pieces of speech that the forum is still open to basically every topic under the sun. So the clearest way to close a forum is to identify particular speakers or particular subjects and exclude everything else. SEPTA clearly hasn't done that. So then the question is, is the breadth of access? Look at the breadth of access. Have they really left it open but for a few narrow kinds of things? And on this record, they plainly have. They accepted more than 2,700 ads and rejected 11, plus then changed their mind about two more that they did accept. That is not a forum that is closed to public issues. I see that my time is up. I'm just looking to see if he has a follow-up. No, I don't have a follow-up. Okay. I don't have any more questions. This is a kind of a case you could go on all day. I agree, Your Honor. Which, of course, the district court did in its opinion. But I mean, I don't have any other questions here. Despite the implication, I have a question. So tell me why Lehman, why isn't Lehman controlling on the question of whether the forum at issue is non-public? It seems to have gotten some play in the Krishna case. So despite its age, it seems to still be in the frame. Sure. Well, if Lehman had decided that all transit ad space were a non-public forum, then Christbride Ministries came out wrong. But it didn't. I think Lehman stands for the fairly uncontroversial now proposition that the government can reserve its limited property, limited ad space, for some kinds of ads without having to open it for all kinds of ads. That's basically the definition of a non-public forum. And that made sense on that record where Shaker Heights had very limited ad space. We're talking about 55 trolley cars in contrast to SEPTA's thousands of vehicles and hundreds of stations. And the Lehman court said that they specifically noted that Shaker Heights didn't want to jeopardize long-term revenue from commercial ads by having to accept short-term political campaign ads. So that was part of the rationale that certainly doesn't apply here. SEPTA has more than enough space for everyone. And the history is quite different. Shaker Heights had never in its 25-year history accepted political campaign ads of the type at issue in Lehman. Here, SEPTA has a long history of accepting ads much like CIRs. And the record really undermines SEPTA's argument that the type of speech at issue in CIR's proposed ads is incompatible with its ad space because we have record evidence that, for example, SEPTA deliberately entered into a contract to put news content on the digital displays inside of its buses. I have to ask you another question. And I couldn't help when I went over this case and wondered whether the center ever said, did you sit down and try to work out something with the SEPTA lawyers? It seems that kind of a thing that people would sit down and work something out that would be acceptable all around. I don't know. Maybe it's not possible. We did, Your Honor. So after SEPTA rejected the first version of CIR's ad that it proposed, and we – there were many letters back and forth, all of which were in the record. There was not a lot of invitation to negotiate. But even after the deposition in this case, when SEPTA's designee testified about specific little elements of the design in some of the panels of the ad, CIR revised those to omit those areas of concern and submitted a new version without those, and SEPTA again rejected it. I know. But I was talking about actually sitting down at a table. Well, maybe it wouldn't matter. But I know that there were revisions. All right. I don't have any other questions. Well, then let us move on. Okay. Thank you. Thank you. Good morning, John. Good morning. I am Mary Ellen Madden from Montgomery McCracken, representing APALEE SEPTA. The dialogue before Judge Bailson that we had was largely, almost entirely, about political. And what does that term mean in the context of these regulations, these advertising standards? We didn't have a dialogue about the other portions, economic, social. I would say layman. The ACLU would say mansky. And that was the argument we had below. But I think we do have to address what political means, because that's what makes the standards workable or not with regard to the dialogue we had. Mr. Benedetti said they meant honor about politics and an application that meant about government or government affairs. It wasn't a standalone term. It was put in the context of political messages and political advocacy on issues involving politics, et cetera. In those contexts, SEPTA was remarkably consistent, Judge Bailson found. And then there were a handful of gray areas that the ACLU pointed out. They are on page 15 of their brief. There were 10 where they said, look at these areas. They're political, and you still ran the ads. And six of them were public service ads that were put forward by the government. It was government speech. Two of them weren't run on buses, Facebook and the ad for the cable company, Fusion. One of them, the DNC ad, was something that welcomed conventioneers. And there was a union part of that that we did allow in, and Mr. Benedetti said we shouldn't have done that because that one conveyed a political message. Well, as we have this discussion about political, it's all in the context of reasonable application. Now, I know that as you've been citing these examples, they certainly seem like it was applied. But the question is, can you merely look at that term in the context of a policy and say, I know how this will be applied? With that in mind, with that sort of quandary or challenge in mind, here's my question. There are going to be a series of questions on the subject. So would any advertisements discussing the subject of racism be permitted under the current advertising standards? Would that be deemed political? Let's suppose a play about racism. A what? A play. Yes. Broadway play about racism. That would be allowed. Hamilton would be an example. If we got it's about politics. But if an ad for the play Hamilton were to be brought to us for the buses, that isn't a piece of advocacy. It's not a political message. It doesn't convey a political idea. It's trying to sell tickets. OK, fabulous. Then let me come at you with this further step. Would the current advertising standards allow an advertisement that depicted I use girl because I mean girl like seven year olds. So nobody's whatever. A black girl, a white girl and an Asian-American girl are holding hands. Right. And it says below, this is how racism ends. Is that political? No, I don't think so. That's more a platitude. It's not it's not advocacy. OK, same picture below it. It says this is what America looks like. Political. Who's putting the ad on? Oh, that's a good comeback. Why does that matter? Well, if it's if it's part of a commercial campaign. What is Benetton? Benetton is famous for ads like this. And a Benetton ad will show multiracial content talking about uniting the world through their product. But they're selling a product. We would not do that as political. If it is about times from then. What about an ad from The New York Times about its 1619 project? You know what I mean by that? Yes. And as The New York Times, if that is just an exemplar of the kind of things they run, it's not pushing the political idea. We would run that. It's about everything involved in the 1619 project. But if what they're trying to do is the ad discerns what they're trying to do is sell The New York Times and say this is an example of the kind of content we run. We would allow that. So if it said this is how racism ends, but it was the DNC, you wouldn't run it. But if it said this is how racism ends and it was Joe Greenaway, you would run it. Well, not not necessarily clear. We would want to know something about what we what we try and do is figure out. Greenway, not a federal judge. Whether it's a message. We're trying to figure out whether it's a message. And whether it's advocacy. And we may get we may get a message no matter who the contributor is. Right. There's gray areas here. And in the gray areas, the trick is to be consistent in the way you treat the ads. Well, how about my question here? I raised before an ad that says support your local merchants. And that would certainly be an advertisement expressing or advocating a position about an economic matter. It would seem to violate the exact words of Section B. But we didn't grapple with that at the district court level. But, Your Honor, Lehman also deals with issue oriented ads and uses those words issue oriented. And, of course, an economic issue would be an issue oriented ad. In your example, I'm not sure what the issue is. I'm not sure that the issue is we're fighting. We're fighting Amazon. And in other words, the idea is we want to fight the big boys and support the local merchants. That's what we're trying to do. And I think there are ads like that. And we would not view an ad that said support your local merchants as political. We would view an ad that said fight mega firms. No, I didn't. I didn't suggest it as political. I suggested it as economic. Well, the question is, at what point does it become an issue? And it's public issues that we're trying to address here in the context of Lehman. And our objective is to be consistent in our application of these guidelines. There will be gray areas. Nancy said there would be gray areas. Lehman said. Well, Lehman's reference to gray areas means they're going to be tough calls. But I guess the question that arises in this context is when you think about reasonable application, the question isn't whether you'll be making good decisions. But the question is when the when the the reader of the policy looks at it, the reader can discern what it is that you're talking about. Let me take political. The word political is an integral part of our landscape without anyone ever defining it. It comes up almost 4000 times in the U.S. code. Not once is it ever defined as a standalone item. No court has ever, to my knowledge, defined the term political and no court is ever required to be defined. Yet Lehman and Nansky both use the term political. Nansky says it's OK to have exclude forms of political advocacy. It doesn't explain what that means. If we uphold you in this case and we take a narrow view, we're just ruling on the particular advertisement. What should our theory be? What should we say? Why are we upholding it? You're holding it because Lehman says that the ad that we have the discretion to make these calls. And they say we have it just like we were a newspaper of a or any other media concern. And when they say that, they then say, but you're a government. So you're also constrained by the rule of reason. And reasonableness is defined in co-kindred by the Supreme Court means arbitrary, invidious or capricious. Arbitrary meaning random, invidious meaning with an animus, and capricious meaning whimsical. You can't apply any of those terms to SEPTA's treatment of these ads. Lehman very carefully dealt with the notion of discretion. And SEPTA uses that discretion as well as it can to achieve objectives that are reasonable. The objectives that are reasonable are to keep the ridership up and to protect passengers from the discomfort of a captive audience, having to see ads that advocacy ads that often may be may make them uncomfortable. Well, how do you how do you draw a rational line between political and non-political? As you as you as you think about advertisements. Right. So I love your reference there. You know, political hasn't been defined in this context in this context. That's great. But it doesn't necessarily help us here. Well, political. I think we do it in application. If you take a look at the DNC ad again, there was just welcoming conventioneers, even though it was about a political convention, that ad came in. What didn't come in or shouldn't have come in was the ad by a union welcoming them and then talking about its union perspective. Because that was non-political. And the second one is political. It's our standards of political message and political advocacy. And we can see those to be similar ideas. One is the conveyance of a political idea. The other is advocacy of the idea. Same same territory. And so it's not just being about something political. It's being about something political and trying to convey it in a persuasive way. Well, let's move to subsection B for a minute. What what does it what are social issues? Well, we didn't get into that at the lower level so much. We had a debate about that. What I have to do now. I think that would be in the word issue is what's important here. And the context of issue, which is someone has to be. We don't get message here. It's only political. It's only advocacy. So a piece of advocacy on a social issue would be an LGBT issue, for instance. It would be protect LGBT rights. That would be a social issue. It seems that the way that B is constructed, you'd have to think really hard to think of anything. Anywhere that wouldn't fall within its ambit. And if that's so, then how do you meet reasonable application? What we think happens is by the pioneers. What's left is what layman said would be left. What you have left is commercial and public issue. So when we apply our standards, what's left in the end of those categories. So so so that means that the the the result that you want on behalf of your client is no constitutional violation. The advertising standards are fine and leave us alone to reject C.I.R. and continue making decisions based on this. This definition of what's permissible and constitutional as it comes out in the advertising. So to affirm Judge Bailson's order. In total. A few minutes ago, you defined reasonable. I reference to that. Yes. Isn't reasonable. Also, more recently defined by Mansky as guided by objective and working workable standards. Well, let's talk about the way I read. It's the amalgamation of factors. They talk about the breadth of the word political, but then they sanction it and it's used in the career case. Rivers is working, which is a military basis. And in Lehman, which is another unique forum, which is Busset. And then they say, you also have to look at not only the statute, but the interpretation of the statute. And there were two problems with the interpretation of the statute. One problem was that the state of Minnesota interpreted the statute. The word political to mean political in the context of the issues at the polling place that day. So the election judges had to be familiar with every single platform, with every single candidate. And then they said to make it worse, they also include in political the groups that support those candidates. So it could be nothing about the positions taken by those groups. So you'd have to have a mental Rolodex of hundreds of issues as an election judge. They said that was an impossible standard. Why isn't the same true here when you have religious, historical, political, social, all of those categories? Well, what made it unworkable in Minnesota versus Mansky was that they had to do that on the spot as someone walked in wearing the apparel. We take every ad. We have a three step process where we drill down, we look at the ad, we understand it, and then we make a determination. And it is admittedly rare that we turn something down. Now, that doesn't mean the forum's open because the measure is not the 2,700 ads. The denominator isn't the 2,700 ads that we accept. The denominator has to be the number of ads that would fall arguably within the standards. And then the numerator being the ones that we rejected. It's a very different standard. Do you know what those numbers roughly are? Well, Judge Belson found the correspondence between the two. I have the red light. You do. It's a suggestion. How do you reconcile Mansky and Lehman? I don't think they say anything different. I think Lehman says they're unique forums. And in these unique forums, the rules are different. And they're different because of the captive audience and the nature of the business being conducted. And that's Supreme Court precedent that Justice Roberts did not want to upset. And he didn't. My question a minute ago about Mansky was its requirement that these policies have to be guided by objective and workable standards. And you answered by saying, yeah, but the Mansky court blessed the use of the word political in Greer and Lehman. But I don't think you really answered my question about objective, workable standards. Your Honor, the court then used the term political advocacy, which it did not define. And I think what it's saying there is that there's a general understanding how these terms work, but you have to be consistent with them. And that's why, remember, Justice Roberts then talked about the gray areas. It doesn't have to be precision. So what they're saying, I think, is a gradation. And in the gradation of terms, Mansky fell too far to the wrong side. Judge Greenberg, do you have any other questions? I have no more questions.  Thank you. Thank you. A few responses. The Lehman court did not have to decide whether undefined bans on political speech or issue ads were workable, because that challenge was brought by someone who wanted to put up an electoral campaign ad, which is why the first sentence of Lehman describes the issue presented in that case as being about whether the transit authority was required to accept paid political advertising on behalf of a candidate for public office. That's not what we have here. And our argument is not that the word political has no definition. It is that in Mansky, the Supreme Court said that various dictionary definitions of the term political were not sufficient to constrain government officials' discretion about what comes in and what comes out. So there's no doubt that you can use the word political in a sentence and have people understand what you mean. That is different from saying that the word on its own is enough to allow the government to censor speech it deems political, and while allowing speech it deems nonpolitical. And the standard of reasonableness is not rational basis review. So the record does matter here. And the difference between keeping, say, a mental Rolodex of issues, as was required by Minnesota statute, and an actual Rolodex of issues doesn't matter. It doesn't matter that SEPTA has time to Google and consider whether to accept an ad before it makes that decision, because regardless, that Rolodex, those decisions about what is an issue and what is political, are inevitably going to be informed by the worldview of the person making that decision. So it doesn't matter that SEPTA has more time to apply these standards than the election judges in Mansky. For all of these reasons, the court should reverse the judgment below with instructions to enter judgment for CIR. Thank you very much. If there's nothing further, thank you. Just a word to counsel, wonderful papers, interesting and difficult case. We appreciate the level of the advocacy today, and we'll hold the matter under advisement. Thank you.